In the Matter of IRA HAUPT & COMPANY, a Limited Partnership, Bankrupt.

No. 64 B 259.

United States District Court
S. D. New York.

July 29, 1969.

Weil, Gotshal & Manges, and Seligson & Morris, New York City, for trustee, Harvey R. Miller, New York City, of counsel.

Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, for objectants, Max Freund, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for Chase Manhattan Bank, N.A. and New York Stock Exchange.

## OPINION

MOTLEY, District Judge.

This is a petition to review an order and decision of the referee in bankruptcy, Edward J. Ryan, who authorized the trustee in bankruptcy, Charles Seligson, as trustee for the bankrupt, Ira Haupt and Company (Haupt), to compromise two controversies. These controversies arise out of the sea of litigation spawned by the so-called "Salad Oil Scandal" of November 1963. American Express Warehousing, Ltd. v. Transamerica Insurance Co., 380 F.2d 277 (2d Cir. 1967). The referee also approved the proposed settlement agreements and authorized the trustee to take any and all steps in the performance of the agreements. The referee's decision and order are affirmed.

## I. PRELIMINARY STATEMENT

The first controversy involves the claims of Haupt against American Express Company (Amexco). These claims are embodied in a complaint filed by the trustee on behalf of Haupt and pending in the Supreme Court of New York. The complaint contains three causes of action.

The first cause of action alleges, in essence, that Amexco conducted its field warehousing activities at Bayonne and Jersey City, New Jersey, through subsidiaries, American Express Field Warehousing Corporation (Field) and its successor, American Express Warehousing, Limited (Limited) and that both of these subsidiaries were dominated and controlled by Amexco to such an extent that they were mere agents and instrumentalities of Amexco. It is further alleged that these field warehousing subsidiaries were operated in a negligent manner in that Amexco failed to take reasonable precautions, although the danger was foreseeable, to prevent the fraud and forgery which occurred with respect to the storage of goods in, and the issuance of receipts at, its field warehouses. It is then alleged that as a result of such negligence, Anthony De-

Angelis, the president of Allied Crude Vegetable Oil Refining Corporation (Allied) caused Amexco to issue millions of dollars worth of warehouse receipts for which there was, in fact, no oil in tanks under the control of Field and Limited at Bayonne. It is next alleged that such negligence enabled DeAngelis, in or about October or November 1963, to appropriate from Limited at its field warehouse in Bayonne a quantity of warehouse receipts which DeAngelis thereafter caused to be forged or otherwise caused to be executed and to appear to have been validly issued by Limited. Then such forged receipts were allegedly transferred by DeAngelis to Haupt, or to banks for Haupt's account, as security for loans made by Haupt to Allied or for margin for commodity transactions engaged in by Allied in which Haupt acted as Allied's broker. These receipts had an alleged face value of $18,461,707.-44, the loss of which allegedly has been sustained by Haupt. It is further alleged that Haupt's business, valued at $20,000,000, has been completely destroyed as a result of Amexco's negligence. Allied, since November 1963, has been adjudicated a bankrupt and, it is alleged, Allied's total indebtedness to Haupt is $31,823,726.13. This latter amount, together with $20,000,000 for the alleged value of Haupt's business, is sought as damages in the first and second causes of action.

The second cause of action alleges that the negligence described in the first cause of action was gross negligence and wilful, wanton, and reckless conduct on the part of Amexco resulting in injury to Haupt of more than $50,000,000. Punitive damages are also sought. It is alleged that the first two causes of action arise under New Jersey law.

The third cause of action seeks $18,000,000 damages, in the alternative, on the theory that the ten forged warehouse receipts were issued to Haupt, or its banks, by agents or employees of Amexco with actual or apparent authority from Amexco on which Haupt relied to its detriment. Amexco is, consequently, estopped, the complaint alleges, to deny its liability as to the face amount of these receipts.

The second controversy arises out of the claims of Haupt against Allied and result from their mutual arrangements. These claims have been filed in Allied's bankruptcy proceeding now pending in the United States District Court in New Jersey claiming $31,823,726.13 against that estate.

The settlement of each of these controversies is conditioned upon approval of each by the appropriate bankruptcy court. Thus, the proposed settlement with Allied (Trustee's Exh. 5) was submitted to the Allied Bankruptcy Court in New Jersey which has approved that proposed settlement (Tr. p. 451-452).[1]

There were a number of other conditions precedent which had to be satisfied before these settlements could become final and binding on all parties. (Trustee's Exh. 2, p. 6; Exh. 3, p. 2; Exh. 7, p. 21-22). These conditions have now been met, except a final approval of this court and a Haupt closing date (which must now be fixed within ten business days after final approval here). (Tr. p. 460-461).

Suit was brought unsuccessfully by shareholders of Amexco in the Supreme Court of New York seeking to enjoin these and other proposed settlements. (Trustee's Exh. 15B, 15C). The final determination of this suit in favor of the settlements was another condition precedent. (Tr. p. 31, Trustee's Exh. 2, p. 6, Trustee's Exh. 7, p. 21-22).

The final approval of Limited's petition for an arrangement under Chapter XI of the Bankruptcy Act was another related condition precedent. (Tr. p. 32, Trustee's Exh. 7, p. 22). A claim for $18,461,637.44 had been filed on behalf of Haupt in that proceeding. (Trustee's Exh. 2, p. 1).

---

1. Tr. p. refers to the pages in the transcript of hearing before the referee.

Another significant condition which has already been met was a ruling from the Internal Revenue Service that funds being made available by Amexco under this settlement with Amexco and under the Basic Proposal are deductible. (Tr. p. 30, Trustee's Exh. 3, p. 2; Exh. 7, p. 21).

The Basic Proposal (Trustee's Exh. 7) is an underlying agreement presented by Limited's official creditor's committee whereby Amexco has agreed to establish a fund, over and above Limited's insurance, for the payment of claims against Limited resulting from Limited's issuance of warehouse receipts for which there was, in fact, no oil in its possession and for the payment of claims arising out of forged receipts. The Basic Proposal has been adopted by the official creditor's committee of Limited as a part of its reorganization plan (Trustee's Exh. 7, p. 1–3) and that plan has been approved by this Court. (Ryan, J.) (Trustee's Exh. 26).

Claims filed in Haupt's bankruptcy, Allied's bankruptcy, Limited's bankruptcy and the suit against Amexco, along with other suits arising out of the Salad Oil Scandal, are the subject of these related compromise proposals. (Trustee's Exhs. 1–8). Consequently, the terms of the proposed settlements and the underlying agreements are complex and interrelated with the claims of many others who were likewise engulfed in this financial debacle. However, the salient provisions of the instant settlements and agreements (for which the official creditor's committee of Limited will act as special trustee for the purpose of receiving and disbursing funds and documents (Tr. p. 27, Trustee's Exh. 1)), are as follows:

1) The Haupt trustee will receive from the special trustee $2,500,000, in cash, on the Haupt closing date in full settlement of its claims against Amexco and its affiliates and certain insurers. Amexco is committed to pay to Haupt's trustee $1,150,000 (Amexco-Special Trustee Agreement, Trustee's Exh. 3, p. 1–2). The balance of $1,350,000 is payable in accordance with directions given by various acceptors of the Basic Proposal (Trustee's Exh. 6, p. 2).

2) The trustee's claim against Allied in the sum of $31,823,726.13 is to be allowed (subject to withdrawal or disallowance of duplicative claims) but will be subordinated to "the extent of its proportionate interest in the aggregate amount required to pay each composition creditor, after payment of administration expenses and priority claims, an amount equal to fifty percent" of its allowed claims, plus interest on such distribution at the rate of 6% per annum. (Trustee's Exh. 5, p. 1).

3) If Limited executes and delivers a general release in favor of Haupt and the Haupt trustee, the Haupt claim filed in Limited's Chapter XI proceeding will be withdrawn (Trustee's Exh. 2, p. 2 of Exh. A thereto).

4) The collateral security held by Continental Illinois National Bank and Trust Company of Chicago, represented by warehouse receipts pledged by Haupt, shall be valued in the sum of $1,400,624.-18 (less reasonable collection expenses, including attorney's fees and legal expenses, as may be fixed by this Court but not to exceed $200,000). This valuation is determined by the amount Continental is to receive from Amexco pursuant to agreement. (Trustee's Exh. 8).

5) For the purposes of enforcement and consummation of the agreements only, the parties involved will submit to the summary jurisdiction of this Bankruptcy Court and provision is made for the service of process relating to such jurisdiction. (Trustee's Exh. 2, p. 6).

6) Provision is made for the Haupt closing date, a date by which all conditions precedent to the effectiveness of the agreements must be satisfied, and a date for terminating the agreements if the conditions have not been met. (Trustee's Exh. 2, p. 5–6).

The proposed settlements and the underlying agreements resulted from negotiations which commenced in the spring of 1966 between representatives of the

Haupt estate, Amexco, the Allied estate and other interested parties, for the purpose of attempting this settlement. (Tr. p. 2031). It was finally reduced to writing on August 1, 1966. (Tr. p. 17–18). An earlier proposed settlement of approximately $600,000 payable over a six year period had been rejected by the trustee. (Tr. p. 10–14, 234). This rejected proposal is a part of the Basic Proposal (Trustee's Exh. 7) which has now been superseded by the Haupt Settlement Agreement (Trustee's Exh. 2), the Amexco-Special Trustee Agreement (Trustee's Exh. 3), and Direction to the Disbursing Agent (Trustee's Exh. 6).

Notice of the proposed settlements was given to all interested parties. In addition to the trustee, the proposed settlements are supported by all the remaining creditors of Haupt (largely the banks and the New York Stock Exchange) whose claims aggregate $29,-000,000. The objectants are certain limited partners of Haupt whose claims aggregate $2,750,000.

Hearings on the proposed settlements commenced before the referee on November 28, 1966. They continued, intermittently, on 18 days thereafter until May 23, 1967. Thirteen witnesses, most of whom were called by the objectants, testified upon the hearing. The transcript of these hearings consists of more than 2,000 pages. There were exhibits received in evidence aggregating, at least, 2,000 additional pages. The trustee and the objectants filed briefs following the hearing aggregating almost 300 pages.

After the hearing and submission of briefs, the referee concluded that the trustee had arrived at an informed, independent judgment that the claims should be settled. (Referee's Opinion, p. 41–42). He also concluded that the trustee had demonstrated that the proposed settlements were fair and should be approved. (Id. p. 43).

The referee acknowledged in his opinion the applicability of the requisites to approval of settlements of claims in bankruptcy proceedings enunciated by the Supreme Court in Protective Committee, etc., of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). However, he gave no clear indication that he, himself, after an evaluation of the claims, had arrived at an informed, independent judgment that these claims should be settled. Nevertheless, such informed, independent judgment by the referee is clear. He afforded a full hearing to the objectants (Tr. p. 380–381, 495–496, 1178–1179), discussed the strengths and weaknesses of the trustee's claims as the testimony came in (e.g. Tr. p. 1722, 1760–1761), and received briefs on the applicable law (Referee's Opinion, p. 45–46) before concluding that the trustee had based his judgment with respect to settlement upon the required informed basis.

■ It is clear to this court, after a review of the record, the exhibits and briefs before the referee, that the referee had apprised himself of "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the [claims] be litigated." Protective Committee, etc., of TMT Trailer Ferry v. Anderson, Inc., supra, p. 424, 88 S.Ct. p. 1163. It is also evident that the referee formed "an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained [against Allied], and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." Id. p. 424, 88 S.Ct. p. 1163. Finally, it is obvious that the referee compared "the terms of the compromise with the likely rewards of litigation", Id. p. 425, 88 S.Ct. p. 1163, against Amexco and Allied.

■ This court, therefore, concludes that there were adequate facts and valid authority before the referee to make the requisite determinations imposed upon the bankruptcy courts in approving settlements by the TMT case, and that

his failure to discuss the evidence and to evaluate the claims in terms of the applicable law are merely formal defects. Protective Committee, etc. of TMT Trailer Ferry v. Anderson, Inc., *supra*, at p. 437, 88 S.Ct. 1157. It is evident from a reading of the record that the referee's conclusions were based upon the following considerations: 1) although the trustee has amassed enough evidence to get to a jury on the question of Amexco's liability, the outcome is in doubt, the chief problem being whether Amexco's negligence was the proximate cause of the injury to Haupt or, as the referee put it, whether Amexco knew of the theft and forgeries (Tr. p. 729, 732, 919, 1621–1624, 1760–1761, 1802–1804, 1984–1986); 2) litigation of the trustee's claims against Amexco and Allied would involve protracted and expensive litigation, consequently, when these facts are considered against possible actual monetary recovery, if there was one against Amexco and Allied, the amount offered in settlement is fair and reasonable (Tr. p. 176–178, 210–216, 453, 591, 913–925, 935–938); 3) the claim against Allied has been allowed in full by the terms of the settlement, although the likelihood of recovering anything substantial on the trustee's claim against Allied is not very great (Tr. p. 652), since Allied's present assets are only $2,000,000 (Tr. p. 212) and claims already filed against Allied ($176,374,938) are staggering in amount (Tr. 283–286), and since such substantial recovery would be dependent upon the outcome of complex and protracted litigation, brought by Allied's trustee against others likewise involved in the "Salad Oil Scandal", about which there is no certainty. (Tr. p. 211–216, 338, 1027–1032, 1133).

## II. BACKGROUND FACTS

As this court has already found, Palmieri, J., In re Ira Haupt and Company, 234 F.Supp. 167 (S.D.N.Y.1964), aff'd 343 F.2d 726 (2nd Cir. 1965) and Ira Haupt & Co. v. Klebanow, 348 F.2d 907 (2nd Cir. 1965), Haupt was a limited partnership with 16 general partners and 13 limited partners. It engaged in a general brokerage and commission business with its principal place of business in New York City. 234 F.Supp. at 168. It had a number of branches throughout the country and utilized the services of approximately 700 employees. (*Id.* p. 168). The limited partnership came into existence in April 1960.[2] By the terms of the partnership agreement, the partnership was to expire on December 31, 1963, about five weeks before its collapse. (*Id.* p. 168).

In May, 1963, Haupt entered into business arrangements with Allied. Allied's business was the manufacture, purchase, sale and export of vegetable oils and the purchase of contracts for same. Pursuant to their understanding, Haupt was to furnish financing for certain of Allied's operations. This financing was to be limited to two types of transactions. The first involved loans to Allied by Haupt against cottonseed oil or soybean oil "hedged" by earmarked futures contracts sold to Haupt on the New York Produce Exchange or the Chicago Board of Trade. The second type of transaction involved loans to Allied by Haupt secured by contracts for the sale of refined soybean oil to prime buyers. In connection with certain of the loans, Haupt was to receive as collateral warehouse receipts for refined cottonseed or soybean oil. Pursuant to this agreement, Haupt began to act as Allied's broker in connection with the purchase and sale of commodities on the New York Produce Exchange and the Chicago Board of Trade. (Trustee's Petition, p. 2, Trustee's Exh. 24, p. 5, Schedule A, Sloan Exhs. N–1, N–8).

In connection with its business, Allied maintained a tank farm for the storage of commodities in Bayonne, New Jersey. It had been involved in the purchase and sale of cottonseed and soybean oil and the storage of same in tanks for several years. It was in conjunction

---

2. Trustee's Brief in Opposition to Petition to Review, p. 138.

with Allied's tank farm in Bayonne that Field and Limited conducted, and had conducted for many years, their field warehouse activities. This consisted of the maintenance of custody and control of tanks at the Bayonne tank farm and at Jersey City away from the main offices of Field and Allied.[3] Commodities were stored in the tanks at Bayonne and Jersey City for the benefit of the owners of the various commodities such as Allied (at Bayonne) and similar companies such as Freezer House, Inc. (at Jersey City).[4] Some of the tanks at Bayonne had been leased by Allied from Bayonne Industries, Inc. and subleased by Allied to Field and Limited.[5] Other tanks at that same farm in Bayonne belonged to Harbor Tank, with whom DeAngelis did business, and still others belonged to Allied. These tanks were all interconnected by a maze of pipes. It appears that it was possible to siphon off oil from one of these interconnected tanks to the other. Warehouse receipts were issued by Field and Limited to the owners of the commodities, such as Allied and Freezer House which, in turn, used these receipts to secure loans. (Sloan Exh. R., p. 24–25, 112–117, Trustee's Exhs. 19, 21A–21W, Tr. p. 392–395, 1475, 1484, 1707, 1720–1721).

The Field warehousing corporation existed from May 19, 1944 to May 31, 1963. Amexco owned all of the issued and outstanding capital stock of Field. On May 31, 1963 Amexco sold all of its stock in Field to Lawrence Warehousing Company. Prior to the sale, Amexco caused Field to transfer its most prosperous warehouse business, which consisted of the Allied and Freezer House, Inc. ac-counts, to Limited in exchange for all of Limited's capital stock, the assumption by Limited of all obligations of Field arising out of the business transferred, and Limited's indemnification of Field against all liability arising out of such business. Field thereafter distributed to Amexco all of Limited's capital stock. (Trustee's Exh. 7, p. 1–2; Sloan Exh. R., p. 4–21).

Many of the directors and officers of Limited were also directors and officers of Amexco (Tr. p. 1697–1707). Some of the personnel of Field and Limited were paid by Amexco (Sloan Exh. R., p. 139; Tr. p. 1699). The subsidiaries used many of Amexco's business forms (Exh. R., p. 137). Some of Amexco's officials solicited business for the subsidiaries (Exh. R. p. 167). Amexco's officials could sign Limited's checks (Tr. p. 777). Amexco's employees did Limited's legal work (Tr. p. 779). Amexco participated in some of Limited's major business decisions such as the amount of insurance necessary for Limited (Tr. p. 770, 775–776), and whether Limited should declare dividends (Tr. p. 778).

DeAngelis used receipts issued by Field and Limited as collateral security for loans made to him. (Tr. p. 1512–1514). Between June 1962 and June 1963, DeAngelis used such receipts as collateral for three loans made to Allied by another subsidiary of Amexco, the American Express Company, Incorporated (Tr. p. 1498–1499). The first loan of $566,695 was made in June 1962 by the New York Agency of American Express Company, Inc., (Tr. p. 1460–1464, 1514). The president of Amexco who was also president of Amexco, Inc., and

---

3. "A field warehouse is established in space leased by the warehouseman on premises of the owner of the goods or the premises of a customer of the owner." (Sloan Exh. Z for identification, p. 41).

4. Freezer House, Inc. was another DeAngelis enterprise. (Tr. p. 1487, 1541, 1707–1708, 1754). See also, Proctor & Gamble Distributing Co. v. Lawrence American Field Warehousing, 16 N.Y.2d 344, 350, 266 N.Y.S.2d 785, 213 N.E.2d 873, 21 A.L.R.3d 1320 (1965).

5. It appears that it was customary in the field warehousing business for the warehouseman to lease tanks from its customers and to employ former employees of its customers as Limited did with respect to former employees of Allied who were employed at the tank farm in Bayonne. (Tr. p. 1714–1715, See Sloan Exh. Z for id. p. 41).

other dual capacity officers were on the credit committee which approved a line of credit to Allied up to $600,000. (Tr. p. 1496). The second loan for $566,000 was made on October 15, 1962 and secured by another receipt. (Tr. p. 1527–1533). The third loan for $566,000 was made on June 7, 1963, secured by a third warehouse receipt (Tr. p. 1548–1549, 1551–1552), but was still outstanding on November 19, 1963 when Allied commenced its Chapter XI proceeding (Tr. p. 1570). Amexco, Inc. had difficulty in getting Allied to repay the first two loans on time and in getting adequate additional collateral for all of the loans from DeAngelis. It made each of these loans with full knowledge of DeAngelis' unfavorable business reputation. (Tr. p. 1460–1565).

During the period May 29, 1963 to November 19, 1963, Allied also delivered to Haupt numerous warehouse receipts which it received from Amexco's subsidiaries. (Tr. p. 734, 1129–1131). On November 19, 1963 when Allied filed its bankruptcy proceeding, there were 10 warehouse receipts outstanding, purportedly issued by Limited, representing crude soybean oil and crude degummed soybean oil. (Tr. p. 406, 734). These warehouse receipts had an assigned aggregate face valuation of $18,461,707.44. (Trustee's Petition, p. 4, Tr. p. 920–921, 1128, 1132). Nine of these receipts, representing about 13 million dollars of that amount, had been pledged by Haupt with various banks. (Tr. p. 920–922, 1224). The tenth receipt had been received on the very day on which Allied filed its petition for an arrangement under Chapter XI of the Bankruptcy Act in the United States District Court for the District of New Jersey and was thereafter adjudged a bankrupt. (Tr. p. 205). This receipt had an assigned face value of $5,400,000 and had not been pledged by Haupt as security for any loan. It is the only receipt held by the trustee (Tr. p. 205, 617, 1118, 1126–1128).

After Allied filed its petition in bankruptcy, it was discovered that a number of warehouse receipts issued or purportedly issued by Limited and Field relating to Allied's account were issued for commodities far in excess of the actual commodities stored in the tanks at Bayonne. (Tr. p. 1725–1726). They are referred to by the parties as the authorized but fraudulent receipts. (Tr. p. 11, 406; Trustee's Exh. 7, p. 3).

It was also discovered after the Allied bankruptcy, from testimony taken by the trustee's counsel in the Allied bankruptcy proceedings, that DeAngelis had appropriated a pad of blank warehouse receipts from Limited and had forged the signatures of Limited's responsible employees on those receipts. (Tr. p. 182). See also, Bunge Corporation v. London and Overseas Ins. Co., 394 F.2d 496 (2d Cir. 1968), cert. denied, 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968). These receipts, referred to as the unauthorized or forged receipts (Trustee's Exh. 7, p. 3), were then transferred to Haupt or to various banks for Haupt's account. The receipts had been kept in an open file in Limited's office in Bayonne to which Allied's employees had access. Limited's small field office was very near to Allied's premises in Bayonne. (Tr. p. 399–403, 741, 850, 1129–1131, Trustee's Exh. 25). DeAngelis, apparently, had also caused Field and Limited (and perhaps others) to issue to other brokers and banks fraudulent receipts (receipts for which there was, in fact, no oil in the tanks) as well as other forged receipts totaling more than $100 million dollars (Tr. p. 283–285, 405–406). *Bunge, supra;* see also, Proctor and Gamble Distributing Co. v. Lawrence American Field Warehousing, 16 N.Y.2d 344, 266 N.Y.S.2d 785, 213 N.E. 2d 873, 21 A.L.R.3d 1320 (1965). However, it must be continually born in mind that the trustee's action against Amexco is predicated wholly upon forged or unauthorized as distinguished from fraudulent though authorized receipts. (Tr. p. 1129).

On November 20, 1963, as this Court has already found (Bonsal, J.) In re Ira Haupt and Company, 252 F.Supp. 339 (1967), Haupt was in acute financial

difficulties and was suspended from further trading by the New York Stock Exchange on November 23, 1963. As this Court further found, In re Ira Haupt and Company, 234 F.Supp. 167, 168 (1964), the extent of Haupt's capital deficiencies at that time was in the neighborhood of $20,000,000. In order to effect a rapid settlement of claims and curtailment of all unnecessary expenses, and "in order to preserve public confidence in the stock market", the New York Stock Exchange and Haupt's creditor banks entered into an agreement whereby the Exchange would advance a fund to pay Haupt's approximately 20 thousand customers and the banks would defer their claims against Haupt to the extent of two dollars for every dollar advanced by the Stock Exchange. *Id.* p. 168.

On March 23, 1964, an involuntary petition in bankruptcy was filed in this Court by three of Haupt's limited partners. Subsequently, in the Haupt bankruptcy proceedings, the banks which were parties to the agreement with the Stock Exchange filed proof of claims aggregating more than $29,000,000. Thereafter, the Haupt trustee and the banks and the Stock Exchange reached an agreement with respect to the settlement of their claims which was approved by this Court (Bonsal, J.), In re Ira Haupt and Company, 252 F.Supp. 339 (1967). On October 24, 1966, the trustee filed the present application for approval of the settlement of Haupt's claims against Amexco and Allied.

## III. THE FIRST CONTROVERSY

The trustee has brought suit against Amexco rather than Limited on the theory that Field and Limited were mere corporate facades behind which Amexco operated. Limited filed a petition for an arrangement in this Court pursuant to Chapter XI of the Bankruptcy Act which has been approved. (Trustee's Exh. 26). All of Field's interests in the warehouse operations at Bayonne were sold to Limited at the end of May 1963. The forged warehouse receipts upon which the trustee's suit against Amexco is based were issued by Limited between October 24, 1963 and November 19, 1963. (Trustee's Exh. 25, Referee's Opinion, p. 5).

The allegations in the trustee's complaint against Amexco are based, in the main, upon a report of the Creditors' Committee of Limited, dated July 10, 1964. (Tr. p. 726–734). The Creditors' Committee Report was introduced in evidence by objectants upon the hearing before the referee. (Sloan Exh. R.). That report, as it states, was based, primarily, upon review and analysis of approximately 75,000 documents lodged in this Court House in connection with Limited's Chapter XI reorganization proceeding. (Exh. R., p. 1–2). Most of these documents were secured from the files of Limited. Other documents were produced voluntarily by Amexco, Amexco, Inc., the trustee in bankruptcy of Allied, and others. (*Id.*). In addition to these documents, the report is based, in part, upon testimony of Donald K. Miller, former president of Limited, taken in the Limited proceeding, and the testimony of others taken in several proceedings pending in New Jersey state and federal courts. (*Id.*) The 75,000 documents upon which the Creditors' Committee Report is based were examined by the trustee's aids. (Tr. p. 978).

In addition to the material contained in the Creditors' Committee Report, the Objectants subpoenaed (Tr. p. 1459–I) as witnesses the president of Amexco (Clark), the vice president and secretary of Limited, who was also a secretary of Amexco and Amexco, Inc., (Waag), the vice president, International Banking Division of Amexco, Inc. (Powers), and the supervising inspector of Field and Limited (Turner). Clearly it was from the testimony of these officials alone, if not from the Creditors' Committee Report in addition, that the referee got a firm factual basis for concluding that the trustee could get to a jury on the issue of Amexco's liability but the outcome remains in doubt.

The first legal hurdle for the trustee is whether he can successfully pierce the

corporate veil of Limited. In addition to the facts, cited above, that all of the stock of Limited was owned by Amexco and there was extensive involvement on the part of Amexco in Limited's affairs, the Creditors' Committee Report also contains a great deal of information regarding "representations" and "holdings out" by Amexco as to its warehousing business from which the public might have inferred that Amexco and Limited were one and the same. (Exh. R., p. 323–347). However, in this connection, the trustee has three problems.

First, he must show, "Control, not mere majority or complete stock control but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." Second, he must show that, "Such control must have been used by the defendant to commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duy, or a dishonest and unjust act in contravention of plaintiff's legal rights." Third, he must show that, "The aforesaid control and breach of duty must [have] proximately [caused] the injury or unjust loss complained of." Fisser v. International Bank, 282 F.2d 231, 238 (2d Cir. 1960); Hellenic Lines, Ltd. v. Winkler, 249 F.Supp. 771 (S.D. N.Y.1966); In re Sheridan's Petition, 226 F.Supp. 136 (S.D.N.Y.1964).

Consequently, from the very outset of the trustee's case, the question of Amexco's knowledge of the forgeries becomes an issue. This issue is germane to each of the three causes of action pleaded by the trustee in his complaint. Each requires proof that Amexco knew or should have known that DeAngelis stole a pad of warehouse receipts from Limited and forged thereon the signature of Limited's authorized employees and that such receipts were then used by DeAngelis to obtain millions of dollars in loans from Haupt and others.

Again, with respect to the first cause of action, from the testimony of the witnesses subpoenaed by objectants, the referee had an adequate factual basis for concluding that the trustee could probably get to a jury on the issue of Amexco's liability, but the outcome of that cause of action remains in doubt. In this connection, there is the testimony of R. J. Waag and a letter written by him which should be noted. R. J. Waag, who was called as a witness by the objectants, was a vice president and secretary of Limited at the time in question (Tr. p. 1698–1699) and a secretary of Amexco and Amexco, Inc. (Tr. 1699–1700). He wrote a letter to Howard R. Clark, president of Amexco, on November 24, 1963, the day after the public became aware of the "Salad Oil Scandal" in which he advised the president that he could not agree with the president's position, taken at a meeting the day before, that Amexco had taken "every reasonable precaution to avoid a loss of this nature." (Sloan Exh. BN). His testimony was to the same effect. Despite Waag's damaging testimony with respect to Amexco's negligence in the operation of its field warehousing facilities, upon cross examination by Haupt's counsel, Waag testified, without equivocation, that prior to November 19, 1963, notwithstanding all of his own investigation and concern about conditions at Amexco's field warehousing operations in Bayonne, he did not know, believe, or suspect that: 1) Field or Limited was issuing warehouse receipts representing oil which did not exist; 2) Allied was subleasing tanks to Limited or Field which it did not have under lease; 3) Mr. DeAngelis or anybody else had stolen warehouse receipt forms of Limited which were being forged by Mr. DeAngelis; or 4) any of the inventories taken at the tank farm in Bayonne were false. (Tr. p. 1781–1782). The other Amexco officials who were examined testified to precisely the same effect. (Tr. p. 1621–1624, 1802–1804, 1984–1986). In short, although there was a great deal of evidence before the referee from which a jury might conclude Amexco was negligent, there is also evidence from which a jury might con-

clude, as Amexco asserts (Tr. p. 682), that DeAngelis' theft and forgery of the warehouse receipts was an intervening superseding cause of the injury to Haupt which relieves Amexco of liability.

There is no dispute that Haupt's loss resulted from the forged receipts; all three causes of action are predicated thereon. If New Jersey law is applicable to the first cause of action for negligence, as alleged, then, in order to prevail, the trustee, in addition to showing that Amexco was negligent, must prove that Amexco's negligence was a proximate cause of the loss to Haupt. Kulas v. Public Service Elec. and Gas. Co., 41 N.J. 311, 196 A.2d 769 (1964). In determining the existence of proximate cause, the New Jersey court must first inquire whether Amexco's conduct constituted a cause in fact of Haupt's loss. *Id.* In other words, was Amexco's negligence a cause of the theft and forgery? Under New Jersey law, Amexco's negligence, if proved, would not be regarded as a substantial factor in bringing about Haupt's loss if Haupt's loss would have occurred just as it did even if Amexco had not been negligent. *Id.* In short, would DeAngelis have stolen and forged the receipts even if Amexco had not been negligent?

"The intervening cause which operates to bar a plaintiff's recovery in a negligence action must be a culpable and efficient cause." White v. Ellison Realty Corp., 5 N.J. 228, 74 A.2d 401, 403, 19 A.L.R.2d 264 (1950). "An efficient cause is 'the one that necessarily sets the other causes in operation.'" *Id.* "It is the 'act or omission which directly brought about the happening complained of, and in the absence of which the happening complained of would not have occurred.'" 74 A.2d at 404.

Although the trustee alleges in his complaint that the first cause of action arises under New Jersey law, neither the trustee nor the objectants rely upon New Jersey negligence cases; on the contrary, they rely upon New York negligence law. The applicable law question is not discussed by either party. However, if we assume that New York law applies, the trustee must also prove that Amexco's negligence was a proximate cause of the loss resulting to Haupt. (Again, the loss resulted from the forged receipts). Colban v. Petterson Lighterage & Towing Corp., 19 N.Y.2d 794, 279 N.Y.S.2d 735, 226 N.E.2d 541 (1967); Tsitsera v. Hudson Transit Corp., 14 N.Y.2d 855, 251 N.Y.S.2d 968, 200 N.E.2d 633 (1964); Rivera v. City of New York, 11 N.Y.2d 856, 227 N.Y.S.2d 676, 182 N.E.2d 284 (1962).

Several of the cases cited by the trustee point up the difficulty involved in overcoming the proximate cause hurdle.

In Hudson Trust Company v. American Linseed Company, 232 N.Y. 350, 134 N.E. 178 (1922), a number of stock certificates which were properly signed by officers of the defendant company were placed in charge of the transfer agent of the company. These officers were replaced by newly elected officers a short time thereafter, but the certificates signed by them were not cancelled. Several years later a general clerk stole one of these certificates, forged thereon the name of an officer of the trust company which was the registrar of the stock of the corporation, and pledged the certificate to plaintiff as collateral security for a loan. When the clerk defaulted on the loan, the certificate was sold at public sale and transferred several times. Transfer on the corporate books, however, was refused and the fraudulent acts of the clerk discovered. Plaintiff refunded the money it had received from the sale of the stock and brought suit against the purported issuer of the certificate based on alleged negligence in permitting its agents to so deal with blank certificates containing signatures of its officers as to enable a fraudulent over-issue of stock to occur. The asserted negligence of the defendant consisted of (a) the conduct of its business in respect to the issuance of stock; (b) the failure to properly keep check upon its outstanding stock; and (c) failure on the part of defendant to exercise reason-

able supervision over its employees. The court, however, refused recovery because it could find no negligence on the part of the defendant since leaving signed blank stock certificates with a transfer agent was a "common custom." Nor had the general clerk who stole the certificate any authority to issue or transfer certificates. Furthermore, the stock registration books disclosed that the certificate in question had not only never been issued, but had been cancelled. A right of recovery, according to the court, has only been recognized in such cases when the defendant company, the purported issuer of such a certificate, has either represented the genuineness of the certificate or entrusted the issuance to its agent who then fraudulently issued the certificate. Here, the general clerk was an unauthorized intervening agent who perpetrated a crime solely with a view to his private gain and without semblance of authority possessed by him as an officer, agent, or servant of the defendant.

Also cited by the trustee is Saugerties Bank v. Delaware and Hudson Company, 236 N.Y. 425, 141 N.E. 904 (1923). In that case, the defendant carrier delivered to a consignee a shipment of wheat, but failed to collect the bills of lading from the consignee in violation of the provisions of the bills themselves and of New York Penal Law of 1909, Consol. Laws, c. 40, § 365 (McKinney's App. 1967). Several months thereafter the consignee altered the dates on these bills and presented them to a bank as security for a loan. When the borrower defaulted on the loan, plaintiff bank sued defendant carrier for negligence in failing to collect the bills of lading since it could not deliver the wheat purportedly covered by the bills of lading. The court found that if the bills had not been altered, they never would have been accepted as security, and it was the consignee's criminal act in altering them that made them appear genuine. The court, in finding that no recovery could take place in the absence of a supportable finding of fact that the carrier should have anticipated what took place, stated that:

" * * * the act of a party sought to be charged is not to be regarded as a proximate cause unless it is in clear sequence with the result and unless it could have been reasonably anticipated that the consequences complained of would result from the alleged wrongful act; that if the consequences were only made possible by the intervening act of a third party which could not have reasonably been anticipated then the sequential relation between act and results would not be regarded as so established as to come within the rule of proximate cause." 236 N.Y. at 430, 141 N.E. at 905.

Moreover, the court explained that "[u]nder ordinary circumstances no one is chargeable with damages because he has not anticipated the commission of a crime by some third party." 236 N.Y. at 431, 141 N.E. at 905. In this case, the court held that it could not be said as a matter of law that the defendant should have anticipated that stale and useless bills of lading would be resurrected into a condition of life by the crime of forgery.

Of similar import is Benenson v. National Surety Company, 260 N.Y. 299, 183 N.E. 505, 85 A.L.R. 79 (1932). In this case plaintiff alleged that defendant surety company had been negligent in allowing its fully executed forms and documents to lie about and be exposed in its offices thus making those documents available to strangers having no authority to make use of them. The court, in striking out this cause of action, stated that:

" * * * the defendant was under no duty to the world at large to safeguard its own property from theft at least, unless the possibility that the property would be stolen and then used by the thief to injure another constituted a hazard which a reasonable man would have foreseen and guarded against." 260 N.Y. at 302–303, 183 N.E. at 505.

The court, however, distinguished the situation where a person or corporation may be held liable upon a forged or stol-

en certificate where such instrument is actually authenticated and delivered by a person clothed with authority to issue or deliver such instruments and to make representation as to their authenticity. In those cases liability is predicated on the responsibility of a principal for the act of his agent acting within the scope of his actual or apparent authority and the action is based upon the instrument itself.

As for the cases cited by the objectants, most do not deal with negligence. In Corn Exchange Bank v. American Dock and Trust Company, 163 N.Y. 332, 57 N.E. 477 (1900), the president of the defendant company fraudulently issued warehouse receipts and used them as collateral for a loan. The defendant company was estopped to deny the validity of the receipts.

Similarly, in Zabriskie v. Smith, 13 N.Y. 322 (1855), plaintiff was induced by fraudulent misrepresentations of defendant to extend credit to a third person. The defendant was properly held liable for all extensions of credit effected by the misrepresentation.

Hotaling v. A. B. Leach & Co., 247 N.Y. 84, 159 N.E. 870, 57 A.L.R. 1136 (1928), likewise involved fraudulent misrepresentations by defendant which induced plaintiff to purchase a bond for investment. The purchaser was found to be entitled to recover all loss which proximately resulted from the fraud.

Here, the crucial finding necessary for disapproval of the compromise and settlement of the claim against Amexco is the existence of some kind of clear evidence that Limited knew of the theft and that forged unauthorized warehouse receipts as opposed to the fraudulent authorized receipts had been issued. Then this knowledge must be attributed to Amexco by piercing the corporate veil. If negligence and recklessness, as alleged in the first two causes of action, remain the main basis for the suit, proximate cause would seem to present a substantial stumbling block to any recovery.

The concept of foreseeability is also legally relevant here. Under the law of New Jersey, if the intervening act of DeAngelis is one of the foreseeable risks which makes Amexco's conduct negligent, it does not break the chain of causation. Rappaport v. Nichols, 31 N.J. 188, 203, 156 A.2d 1, 9, 75 A.L.R.2d 821 (1959).

As the Court of Appeals for this Circuit recently noted, under the law of New York, the succeeding act in a chain of circumstances which leads from the wrongful act to injury is legally irrelevant and the initial wrongdoer will be held liable, unless the second act "is so unexpected that the injury is not to be a reasonably foreseeable result of the first act." Ingham v. Eastern Air Lines, Inc., 373 F.2d 227, footnote 11, (2d Cir. 1967), cert. denied, sub nom. United States v. Ingham, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967).

There is some evidence from which a jury might conclude that DeAngelis' theft and forgery were so unexpected that the injury to Haupt is not to be considered a reasonably foreseeable result of any proved negligence on the part of Amexco.

First, there is evidence that Amexco, in early 1963, reviewed the risks attendant upon its operation of a field warehouse in Bayonne. There is evidence that after that review it concluded that although DeAngelis' background was questionable, and although in 1960 there had been mysterious telephone calls to the president of Amexco warning of the pilfering of oil at Bayonne, the risks were not very great. The Creditors' Committee Report indicates that on May 21, 1963, Miller, the president of Limited, wrote Clark, the president of Amexco, discussing the history and background of the Allied account. In that letter he stated: "We have never had a shortage at this account. The account has never falsely represented any fact or circumstance to us. About three years ago we had difficulty with a mystery telephone voice which alleged that we were storing a goodly quantity of water in place of

oil. The mystery voice has never been heard in over three years. We did on one occasion discover some water in a few of the tanks *but this was occasioned by leaking steam lines.*" (Exh. R. p. 278).

Second, there is also evidence that Amexco reviewed its insurance coverage in early 1963 and concluded that its $21,500,000 worth of risk insurance was sufficient. The risk which it was considering was the risk of loss resulting from the loss of oil through pilfering. With periodic auditing, one executive concluded, it would be "almost inconceivable that more than $21,500,000 [worth of oil] could be removed before Amexco knew it." (Exh. R. 282).

Third, there are the facts, set forth above, that Amexco's subsidiary, Amexco, Inc., made three loans to Allied between 1962 and 1963 secured by Limited's warehouse receipts. One of these loans for $566,000 was made in June 1963 and was still outstanding on November 19, 1963 when Allied filed its bankruptcy proceeding.

Although there is a great deal of evidence tending to prove that Amexco was negligent, there was also counterbalancing evidence which indicated Amexco might be able to prove that Haupt was not only contributorily negligent but reckless. The testimony before the referee presents real problems in this regard since proof of lack of contributory negligence on the part of Haupt would also be essential to the first cause of action, at the very least, whether New York or New Jersey law applies. Rogers v. United States, 296 F.2d 122 (2d Cir. 1961); Ira S. Bushey & Sons, Inc. v. United States, 172 F.2d 447 (2d Cir. 1949); White v. Ellison Realty Co., 5 N. J. 228, 74 A.2d 401 (1950).

For example: Haupt was advised by its own attorneys not to take Allied's account (Tr. p. 1019–1020); Haupt, apparently, contributed to its own financial collapse since it took delivery of spot oil knowing Allied did not have the money to take delivery (Tr. p. 1117); Haupt's partners knew that other brokerage houses had refused to deal with Allied before Haupt did business with Allied (Tr. p. 1117–1118); Haupt got the last forged warehouse receipt from Allied under circumstances which clearly indicated that prior thereto Haupt knew that Allied was in grave financial difficulty (Tr. p. 1126–1128); Haupt accepted "product" margin from Allied because Allied did not have money to put up for margin (Tr. p. 1128); Haupt's own employees were inexperienced (Tr. p. 819) and failed to keep proper records (Tr. p. 1337, 1344–1345, 1349); no one at Haupt checked the signatures on the forged receipts, received from Limited shortly before Haupt's and Allied's collapse, which contained the misspelled signature of Limited's custodian on several of those receipts. (Tr. p. 1132, Trustee's Exh. 25).

The trustee also relied on the Creditors' Committee Report to support his second cause of action against Amexco. The second cause of action alleges that Amexco failed to take reasonable precautions with respect to the operation of its warehouse activities in Bayonne to prevent fraud and forgery and that such conduct constituted wilful, wanton, and reckless disregard of the rights and interests of Haupt, resulting in the destruction of Haupt's business. It should be noted first that the president of Amexco, whom objectants say should have been examined by the trustee as to his knowledge of the forgery, testified upon the hearing that prior to November 23, 1963 he had no knowledge that Haupt and Allied had any business relationship. (Tr. p. 1986). While it is true that there was some evidence before the referee that Amexco knew, or had reason to believe in 1960 (Sloan Exh. CG and CG 2), that some of the tanks at Bayonne may not have actually contained oil, there does not appear to be any proof thus far that Amexco knew or had reason to believe, as DeAngelis later testified in the Allied proceedings, that he stole the warehouse receipt forms from Limited and forged the signatures thereon. (Tr. p. 182). Even R. J. Waag, who commented upon

his visit to the Bayonne yards in July 1963 that conditions were such that "a crook" at the tank farm could steal Limited blind, did not have reference to warehouse receipt forms. (Tr. p. 1783). Although there was no documentary testimony offered at the hearing regarding DeAngelis' forgeries, and although the trustee failed to offer as an exhibit DeAngelis' testimony regarding such forgeries, the trustee's counsel testified, under oath, before the referee that DeAngelis had so testified in Newark in an examination conducted by him (Tr. p. 182). The hearings before the referee took place over a period of several months. It is now almost six years since the alleged forgeries. There has been no evidence produced by the objectants (who had, themselves, filed a similar suit against Amexco which the trustee then took over) or any other swindled party, which tends to prove that Amexco knew or had reason to believe that DeAngelis had stolen and forged some of Limited's warehouse receipts. See American Express Warehousing, Ltd., v. Transamerica, 380 F.2d 277, 283 (2d Cir. 1967). Forged warehouse receipts were the only receipts claimed by Haupt to be outstanding on November 19, 1963. (Tr. p. 1129). There were other authorized receipts issued by Limited for oil which was not, in fact, there, but none of these receipts was held by Haupt. Again, as the referee pointed out, there was a "vast amount of evidence in the record to show" that the trustee could get to a jury on the question of Amexco's liability, but there would be serious question as to whether Amexco had actual or constructive knowledge of the forgeries. (Tr. p. 1761).

The third cause of action is predicated wholly upon the forged warehouse receipts (Tr. p. 1132). It, too, having alleged that the forged receipts were issued by the actual or apparent authority of Amexco, can succeed only upon a showing that Amexco authorized or apparently authorized the forged receipts.

## IV. POSSIBLE MONETARY RECOVERY AGAINST AMEXCO

The referee was also correct in approving this settlement with Amexco since it appears that Haupt's maximum recovery would be limited to the amount which it actually advanced to Allied against the forged receipts. Cf. Corn Exchange Bank v. American Dock and Trust Company, 163 N.Y. 332, 57 N.E. 477 (1900).

On the first two causes of action, the trustee seeks more than $50,000,000 in damages. The question is what damages can the trustee prove were actually caused by Amexco's acts in issuing the forged receipts, assuming he succeeds in proving Amexco liable for the issuance of those receipts. Of the $50,000,000 damages sought, $20,000,000 is alleged to be damages suffered by Haupt from the destruction of its business. Haupt, the limited partnership, was formed in April 1960 and was to expire on December 31, 1963. In support of the claim for damages for loss to Haupt's business, it is alleged that Haupt earned in excess of one million dollars per annum for many years prior to 1963. However, there is some question whether Haupt's books and records would support the allegation with respect to its earnings (Tr. p. 916) even if it could be proved that Amexco's negligence or recklessness leading to issuance of forged receipts destroyed Haupt's business. The remaining $30,000,000 is Allied's total indebtedness to Haupt. Only a portion of this latter amount was collateralized by the forged warehouse receipts. The remainder of the loss resulted from other business dealings (future contracts) by Haupt for Allied (Tr. p. 569–571). At this point it should be noted also that prior to Haupt's receipt of any of Limited's warehouse receipts from Allied, Haupt had done extensive business for Allied in futures contracts. (12,000 futures contracts with an aggregate value of $90 million). (Sloan Exh. N1–N8). Thus, contrary to objectants' contentions, Haupt, apparently, did not rely

on the fact that Allied had Amexco receipts in extending loans and making purchases for Allied. Consequently, there is serious question whether Amexco could be held liable for more than the amount which Haupt actually advanced to Allied against the forged receipts.

As a result of pledging nine of the ten forged warehouse receipts with banks, Haupt received loans totaling $9,110,000. The Continental Illinois National Bank and Trust Company of Chicago advanced $8,130,000, and the First National State Bank of New Jersey loaned $980,000. Of these amounts, Haupt, in turn, advanced to Allied $7,-500,000. The remainder was retained by Haupt as reimbursement for margin expended by it for the account of Allied. (Tr. p. 917, 920–923). Therefore, if Haupt succeeded on its claims against Amexco, it would probably recover only the actual amount of its loss, i. e., $7,-500,000 resulting from advances against forged receipts. Amexco has agreed to pay the Illinois bank, under its proposed settlement with that bank, $1,400,000 for these receipts in settlements of its claim. (Trustee's Exh. 8). Amexco claims that if Haupt recovered $7,500,000, it would have to deduct the amount payable to the Illinois bank, $1,400,000, from its $7,-500,000 recovery, leaving Haupt with $6,100,000. If agreement should be reached with the New Jersey bank, Haupt's total recovery would be still further reduced. Consequently, says Amexco, Haupt's maximum recovery would be about $6,000,000. The amount offered in settlement is $2,500,000 cash or about 41% of $6,000,000.

## V. OBJECTIONS TO THE AMEXCO SETTLEMENT

The limited partners who oppose this settlement of the Amexco controversy made a whole congeries of objections upon the hearing before the referee which they have distilled in their brief in support of this petition for review.

█ The first objection is that the settlement must be disapproved because there was a failure of proof as to the merits of the settlement. Although it is true that the referee, from time to time, sustained the trustee's refusal to answer certain questions (on the ground that the answer would be harmful to the interests of the bankrupt if the settlements were not approved) the referee, nevertheless, ultimately had sufficient facts before him on which to base "an intelligent and objective opinion of the probabilities of ultimate success." Protective Committee, etc., of TMT Trailer Ferry v. Anderson, Inc., *supra*, p. 424, 88 S.Ct. p. 1163. Questions regarding the trustee's investigation of his claim that Amexco had knowledge of the forgeries (which the trustee's counsel said at various points he would not answer, because of possible harm to the estate if the settlements were disapproved) were subsequently answered by the trustee. (Tr. p. 982–994, 1149–1152). Moreover, the referee permitted the objectants to call the very witnesses, Clark, Waag and others, from whom the objectants claimed the trustee could have obtained information as to the knowledge of Amexco. As a result, the record now contains a sufficient factual basis, as set forth above, to sustain the conclusion that the claim against Amexco should be settled because of the uncertainty of the outcome.[6] In this connection, it should

---

6. The objectants made repeated claims that the settlement with Amexco should not be approved because the trustee did not examine Amexco officials before proposing the settlement. There were several reasons for this. A pretrial order in the trustee's case against Amexco permitted Amexco to proceed first with pretrial depositions (Tr. p. 1159). Additionally, as the trustee pointed out, Miller, Limited's president, had been examined in the Limited proceeding. (Tr. p. 1159). Finally, after discussing the matter with his own counsel and counsel for Allied, the trustee concluded it would serve no useful purpose since, "The higher officials of [Amexco] were not going to admit that they knew about the theft of this book of warehouse receipts or the forgery of the receipts." [Tr. p. 1160].

be noted that the objectants apparently initially believed that before these claims could be settled the referee should satisfy himself by factual proof upon a trial, that the trustee could not succeed in his claims against Amexco and Allied. (Tr. p. 823–824). If this were the standard, the referee would have had a hearing before him which would have reached the proportions of a trial of each of these controversies on the merits. (Tr. p. 820). If settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome. But, as the referee pointed out, there must be factual proof as to what was considered by the referee in arriving at his conclusion. (Tr. p. 435). In the hearing before the referee, there was substantial proof as to what the trustee had before him. There was additional testimony before the referee, especially regarding Amexco's negligence, Haupt's negligence, and the lack of proof as to Amexco's knowledge, to sustain a conviction that the claim against Amexco should be settled. It is also clear from a review of the record that the litigation which would follow a disapproval of this settlement would involve a great deal of additional time and expense to this estate with a doubt as to any recovery remaining, whereas the amount offered in settlement is approximately 41% of what appears to be the maximum recovery possible.

The second objection is that the settlement must be disapproved because of "the state of the record" as to Amexco's knowledge that it was issuing warehouse receipts against oil in tanks which did not exist. The objectants called as witnesses the president of Amexco and other officials of both companies (Amexco and Limited). It was through their testimony that it became clear that knowledge would be a most difficult proof burden upon a trial. Each of these Amexco officials denied all knowledge as to shortages and especially the forgeries. The objectants insisted that the trustee's position was weak because he had not examined Amexco officials with respect

to their knowledge (Tr. p. 386). It is obvious that upon a trial these officials would likewise deny having had any such knowledge.

The third objection is that the referee's order should be reversed because he did not meet the requirements set by the Supreme Court in Protective Committee, etc., of TMT Trailer Ferry, Inc. v. Anderson, *supra*. The *TMT* decision was handed down approximately two months before the referee rendered his decision and is cited therein. It is true, as stated above, that the referee did not analyze the facts and the law as required but, as the court held in the *TMT* case, this, alone, is not a sufficient reason for reversal. There must be an insufficient record to support the referee's decision before reversal could be justified. *Id*. p. 437, 88 S.Ct. 1157.

Next, objectants say that this settlement must be rejected because acceptance will expose the trustee to the loss of $54,000,000 in a suit instituted by him against Haupt's insurer on certain brokers' blanket bonds. But as the referee points out, before rendering his decision he awaited the decision of the Court of Appeals for this Circuit in Bunge Corporation v. London & Overseas Ins. Co., 394 F.2d 496 (2d Cir. 1968), cert. denied, 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968). Bunge is a case arising out of this same swindle and involving another broker who got caught with fraudulent receipts. Bunge sued its insurer which denied liability and which, in turn, filed a third party complaint against Amexco. Bunge then settled with Amexco and gave it a general release. Amexco then moved for summary judgment of dismissal of the third party complaint against it. The motion was granted by the trial court. The insurer then moved for a summary judgment of dismissal of Bunge's action against it. That motion was also granted. On appeal the granting of the former motion was affirmed while the latter was reversed. The Court of Appeals held that under the law of New York (where the suit against Haupt's insurer is pending) the settle-

ment of a claim by the insured against a wrongdoer does not destroy the insured's rights against its insurer when the insurer has disclaimed liability, provided that the settlement is made in good faith. Here, Haupt's insurer obviously has disclaimed liability since the trustee has instituted suit against it. (Tr. p. 1098). In its answer to that suit, the insurer disclaims liability on the ground that the Haupt partners had full knowledge of the fraud and forgeries perpetrated by Allied. (Trustee's Exh. 22). Moreover, objectants stipulated, upon the hearing before the referee, that the insurer had denied liability (Tr. p. 1099).

The other objections raised by the limited partners, that neither the referee nor the trustee had access to important Amexco documents (unspecified, See American Express Warehousing, Ltd. v. Transamerica Insurance Co., 380 F.2d 277, 283 (2d Cir. 1967) and that the referee sustained the trustee's objections to answering certain questions, are essentially the same as their first objection relating to failure of proof as to the merits of the settlement. The answer to that first objection applies to these objections. It is true that the referee seemed confused, at times, about the burden on the trustee in the settlement application. This resulted from the referee's desire to protect the estate from injury in the event that the settlements were not approved. But it is clear that the referee understood, as his remarks disclosed, that the trustee had to support his application by "proof of facts" and not by mere allegations (Tr. p. 435). This included the receipt of certain testimony and exhibits in evidence, not for the truth of the matters asserted therein but to show what the trustee had before him upon which he based his judgment. (Tr. p. 967, 1131).

## VI. THE SECOND CONTROVERSY

Haupt filed a proof of claim in the Allied bankruptcy in March of 1964 for $31,823,726.13. On November 17, 1965, Allied's trustee filed an answer and a counterclaim seeking the return of moneys in excess of $27,000,000 allegedly transferred to Haupt as preferences and fraudulent conveyances under the Bankruptcy Act and New Jersey statutes.

As part of the proposed settlements, Haupt must execute and deliver the Allied Subordination Agreement. This agreement subordinates Haupt's claim (and that of other creditors) in Allied's estate to the extent of Haupt's proportionate interest in the aggregate amount required to pay "composition creditors" (trade creditors) 50% of their allowed claims plus interest at 6% from November 19, 1963 to the date of execution of the agreement. The claims of the "composition creditors" amount to $3.5 million. They will get about half this amount plus interest, totaling about $2 million. (Tr. p. 652).

As the consideration for this agreement, Allied is to withdraw its answer and counterclaim to Haupt's claim, and Haupt's claim is to be allowed, in full, except where duplicative. (Tr. p. 652). However, the trustee's expectations of actually getting any substantial dividend from the Allied estate in payment of this claim are not very great. (Tr. p. 236, 652).

For the reasons already enumerated above, the court concludes that the claim of Haupt against Allied should likewise be settled. The problem in evaluating the Allied part of the settlement exists in two contexts.

First, the potential size of the Allied estate is most important. This must be considered. The probabilities of realizing a sizable estate also must be examined. Haupt as a creditor will share in this estate, if there is no settlement. Further, Haupt's possible contributions to this estate because of recovery of preferential transfers by Allied must also be considered because such contributions would have to be set off against Haupt's dividends as a creditor. In other words, if the Allied trustee has any possibility of recovering $27,000,000 in claimed preferences from Haupt, or any substantial portion there-

of, as against Haupt's claim for $31,000,-000 this is important to a determination as to whether Haupt's claim should be settled. The size of Allied's estate will be determined mainly by its possible recoveries against Bunge and Haupt, since its claims against others are relatively small and the estate, absent any recoveries, is very small.

Second, the Allied settlement must be looked at as a part of the whole settlement. The $2,500,000 immediate cash settlement with Amexco cannot go through without the Allied settlement which, in addition, gives Haupt a release of Allied's claims to preferences against Haupt. Consequently, it may be that Haupt is justified in giving up a future and only potential recovery in the Allied proceedings of some undetermined amount to gain the present cash settlement and the release of large claims against it now.

The assets in the Allied estate at the time of the hearing were about $2 million, $500,000 of which would be chalked off as expenses (Tr. p. 212). As part of the settlement, Allied is releasing its claims not only against Haupt but also against "Bunge and others". (Tr. p. 653). While there is a possibility that some suits may remain unsettled (Tr. p. 236), it is unlikely that the Allied estate will increase much. Therefore, the estate will go completely to trade creditors, assuming settlement. The release of claims against Haupt is the consideration for the agreement. Parties being released are enumerated in Exhibit B to the trustee's application.

Haupt's position is as a creditor filing a proof of claim against a bankrupt. The $32 million is composed of roughly $10 million due on export loans (Tr. p. 531) (Sloan Exh. N 1), $3 million on the financing of spot oil (Sloan Exh. N 1, Tr. p. 1345), and $19 million on the closing out of futures contracts at a loss after Allied's bankruptcy. These contracts had been held for the account of Allied. (Sloan Exh. N 1, Tr. p. 569–71). This $32 million comprises a part of the $50 million damages asserted against Amexco (the remaining $20 million being for the loss of Haupt as a business). Consequently, the two settlements are tied together.

Haupt's proof of claim is part of $441 million in claims filed against Allied. (Tr. p. 279). At the time of the hearing, objections had been filed to $404 million of these claims. (Tr. p. 280). It appears that these claims have been reduced to $145 million (Tr. p. 286) and may be as high as $175 million. (Tr. p. 501–05). Thus, the Haupt trustee's claim in the Allied bankruptcy would be either 18% or 22%, of total estimated claims, depending upon whether the $145 million or $175 million figure is used. Sloan Exhibits A and B detail the claims.

Allied's claims against Haupt derive from transfers made by Allied to Haupt which are alleged to be preferential or fraudulent within the meaning of sections of the Bankruptcy Act and New Jersey law. Most of these transfers were made within four months of Allied's bankruptcy, so as to bring them within the time limits of 11 U.S.C. § 96(a) (b). The total amount of transfers is in the neighborhood of $21.5 million directly from Allied and another $6 million on Allied's behalf from others (Tr. p. 205–06, 312, 507–08, 530–32). This sum is broken down into roughly $6 million for the repayment of export loans (Tr. p. 531), $6.8 million for spot oil (Tr. p. 543), and $18,704,644 for original and variation margin in connection with the futures contracts (Tr. p. 547–548). There were warehouse receipts transferred as "product" margin in connection with the futures contracts. These receipts were assigned a value by Haupt based upon 70% of their stated value and include both forged and fraudulent receipts. (Tr. p. 555). The $5.4 million receipt received from Allied on the day it filed in bankruptcy is not included, nor are the receipts received on November 6 and 12, 1963 (Tr. p. 1221–2, Sloan Exh. N 4).

Sloan Exh. N 8 is a schedule of checks received by Haupt from Allied during

the four months prior to bankruptcy. Transfers by Allied within four months of bankruptcy in excess of $10,000 are detailed in the record by company to which transferred. (Tr. p. 311–312). Allied's claims for the four-month period total $143.6 million (Tr. p. 208, 212–13, 529), of which a $112 million claim is asserted against the Bunge Corporation (Bunge), a $21 million claim against Haupt as we have seen ($27 million if the transfers by others for Allied can be included), and about $11 million in claims against others (Tr. p. 529). The claim against Bunge is thus of paramount importance to the Allied estate. Bunge filed no proof of claim in the Allied bankruptcy (Tr. p. 589), which means that the Allied bankruptcy court has no summary jurisdiction over Bunge, and the Allied trustee must sue in a plenary action.

An initial problem for the Allied trustee with respect to pressing any of his claims is that Allied apparently did not keep good records (Tr. p. 547). The Haupt trustee would have the same problem with respect to pressing any of his claims against Allied (Tr. p. 542–543, 546, 1344). However, the evidence before the referee disclosed the following:

### A. Haupt-Allied Dealings

#### 1. Export loans

Haupt loaned on exports about $16 million to Allied collateralized by warehouse receipts (Tr. p. 531). These transactions appear on Sloan Exh. N–4 (Tr. p. 628–9). About $6 million of these loans was repaid (Tr. p. 531). The warehouse receipts were returned on repayment to Allied, and those returned have been identified as authorized but fraudulent (Tr. p. 628–35), which means that the signatures were valid but little or no oil backed the receipts.

Let us take one example. On May 28, 1963, Haupt made an export loan to Allied (Tr. p. 1348–9) (Sloan Exh. N–3). The check sent to Haupt is shown on Sloan Exh. AA in the amount of $2.5 million. The transaction is shown on Sloan Exh. N–4 as being collateralized by Harbor Tank warehouse receipt B2176. Sloan Exh. N–5 shows a forward sales contract with the purported buyer Continental Grain Company also being furnished as collateral (Tr. p. 1350). On August 15, within four months of Allied's bankruptcy, the loan was repaid (Tr. p. 1348–9, Sloan Exh. N–3) as shown by a check in the amount of $2.5 million (Sloan Exh. N–8). The books of Allied then show the elimination of the warehouse receipt, it presumably having been returned to Allied (Tr. p. 1349–50). None of the books, documents, or correspondence of Allied shows what happened to the rest of the collateral, the forward sales contract (Tr. p. 1350–1).

This particular export loan, unlike others, necessitated a margin call of $250,000 on August 13 because of a declining market (Tr. p. 1347–8). Sloan Exh. N–8 shows Haupt receiving a check in this amount on that date. This sum was returned when the loan was repaid two days later (Tr. p. 1351–3), as shown by the Haupt check to Allied in that amount on August 15 (Sloan Exh. AA). It is interesting to note that a new export loan in the same $2.5 million amount was made on the very day of repayment of the first, Sloan Exh's. AA, N–3, and N–4, collateralized by a new warehouse receipt B2227.

#### 2. Spot oil

The nonregulated account (Sloan Exh. N–1) involves mostly spot oil (Tr. p. 1344–5), but since not all of it was spot oil, one cannot use it to determine exactly the Allied transfers to Haupt in connection with spot oil (Tr. p. 542–3). However, the trustee's accountant noted from N–1 that Haupt paid $6.8 million for spot oil and "presumes" that Allied paid Haupt the same amount for Haupt's advances in spot oil (Tr. p. 543).

This account worked as follows (Tr. p. 544, 626): Haupt would take delivery of oil by purchasing warehouse receipts. When Allied didn't want immediate delivery of the oil, Haupt required it

to put up margin. Then as Allied took the oil, it would make payments for that part taken. The $6.8 million in transfers then consisted of margin and partial payments for the oil.

Sloan Exh. N–8, as explained in the testimony of the trustee's accountant, can be used to illustrate which checks were in connection with spot oil. Of the $132,000 check received on July 23, $125,000 is identified as being in response to a margin call on spot oil (Tr. p. 1328–9). The rest of the testimony on spot oil does not identify the payments as being for margin or partial delivery (Tr. p. 1326–33). By far the largest spot oil payment was made by Bunge for Allied in the amount of $3.6 million on October 1, 1963, (Tr. p. 1215, 1326, 1374). We might infer that it was made to obtain delivery of oil, since the $7,313 payment on the same date relates to charges in connection with the delivery of oil (Tr. p. 1364). Nothing appears in Haupt's records with respect to this sum. The same reasoning might apply to the $1.1 million payment and $11,000 delivery charge on September 17 (Tr. p. 1326, 1360).

### 3. *Futures Contracts*

Haupt bought cottonseed and soybean oil futures contracts for Allied's account almost daily during the four-month period prior to bankruptcy (Tr. p. 559, Sloan Exh. N–7). To buy a contract, Haupt would have to put up original margin with the Produce Exchange Clearing Association (Tr. p. 563–4). Also, at the end of each day Haupt would have to make calculations based on the price changes in the commodity involved in the contracts being held to determine the amount of variation margin. If the price change was an increase, margin might be released; if a decrease, more would be due (Tr. p. 549–50).

Allied, similarly, would settle with Haupt on an almost daily basis (Tr. p. 549–50, 565–6). It would put up original margin for contracts bought and varia-tion margin where required because of a price decrease, or perhaps receive a return of margin where commodity prices increased (Tr. p. 550). However, it is difficult to trace the particular moneys being put up by Allied to particular contracts. Sometimes Haupt would use funds already received from Allied to put up original margin on a contract being bought; sometimes Haupt would advance the funds for original margin, later collecting from Allied. (Tr. p. 564–5). The day-to-day calculations were done informally on yellow paper each day, and Haupt would come up with a net figure of money due as a result of contracts just bought or to be bought and contracts being held (Tr. p. 566–7).

The total transfers in connection with original and variation margin on futures contracts are broken down in the record (Tr. p. 547–553) and includes about $9.8 million in cash and about $3.2 million attributed to "product" margin (after the $700,000 paid on this is deducted). Although Haupt's books did not give the information, the trustee's accountant was able to associate particular checks on Sloan Exh. N–8 with particular margin calls and break the sum into original and variation margin. Thus, the accountant found two margin calls dated July 17, 1963, for $45,000 and $26,600. He noted from Sloan Exh. N–7 that Haupt purchased 46 contracts of soybean oil and 32 contracts of cottonseed oil on this date. He then ascertained from other records that original margin on soybean oil was $300 per contract and on cottonseed oil was $400 per contract. The total equalled $26,600, which he labeled original margin. The other call was then deduced to be for variation margin. Together they added up to $72,000, which is the amount shown on N–8 to have been transferred on July 18 by check to Haupt. (Tr. p. 1994–6). That check was then partly for original margin already advanced by Haupt. Similarly, the $40,000 checks on August 20 and 22 were associated with definite original margin for contracts

bought on August 16 and with specific variation margin (Tr. p. 2000–01, Sloan Exh. N–8). See also the $59,000 and $65,000 checks for September 5 and 10, 1963 (Tr. p. 2002–3, Sloan Exh. N–8). However, most of the checks on N–8, while split between original and variation margin, are not identified as to whether the original margin was for contracts bought or not yet bought.

The last five Limited warehouse receipts received by Haupt for "product" margin on November 6 and 12 (F1365, F1367, F1369, F1370, F1371, Sloan Exh. N–4) are not part of the Allied counterclaim (Tr. p. 1221–2). These are identified by the accountant as forged (Tr. p. 556). He also identifies F1364 as having a value of $700,000 and forged (Tr. p. 556, Sloan Exh. N–4). This Limited receipt was used for "product" margin on October 31, but there is no testimony that it is *not* part of Allied's counterclaim.

#### 4. Other

Aside from the three accounts just described, Sloan Exh. N–8, as explained by the accountant, shows checks from Allied to Haupt for other things in a relatively small total amount. The $75,000 and $30,000 checks on July 25 and 26 are attributed to an unidentified running account in the nonregulated account (Tr. p. 1329–30). The $22,285 and $5,211 checks on July 31 and August 16 are believed to be interest on export loans (Tr. p. 1346, 1354). The $11,377 on September 17 represents charges in connection with the delivery of spot oil as does the $7,313 on October 1 (Tr. p. 1360, 1364).

### B. Bunge-Allied Dealings

Allied has asserted a claim of $112 million for preferences and fraudulent conveyances against Bunge (Tr. p. 214, 312, 323, 529). These claims involve a "continuous course of dealings", a "revolving situation, money in and money out, passing from one to the other," in "substantially the same" way money passed from Haupt to Allied, i. e., a "revolving type of credit situation" (Tr. p. 1136–1138). The Haupt trustee found the running account aspect similar in the Haupt and Bunge situation (Tr. p. 1236). Bunge used Limited warehouse receipts exclusively in its financing in the four months prior to Allied's bankruptcy (Tr. p. 1136). It denies extending any unsecured credit to Allied (Tr. p. 1141).

The Allied-Bunge debt reached its peak of $44 million in September of 1963 (Tr. p. 1138, 1238, 1387, 2010) and had declined to $16 million by the time Allied filed in bankruptcy (Tr. p. 1239, 2017). These two sums include what is known as the "float". This operated through the Bunge cashier, one Caterina, who would receive certified Allied checks from an Allied employee and issue whatever documents were required, then retiring to the washroom where he would exchange the certified checks for uncertified ones from the Allied employee. Caterina would then hold the uncertified checks until Allied okayed their deposit. For these services Caterina received a bribe from Allied, and Bunge denies knowing of this activity (Tr. p. 1138–40). The float was around $20 million in September and closed at $5.4 million on the bankruptcy date (Tr. p. 2015–17).

### C. The Applicable Statutes

The Allied trustee relies on § 60(a) (b) of the Bankruptcy Act, 11 U.S.C. § 96(a) (b). Generally, Section 60 allows a trustee in bankruptcy to recover what is termed a preference in certain circumstances. A preference is defined in subsection (a) as a transfer of the property of a debtor to a creditor on account of an antecedent debt, made or suffered by the debtor while insolvent and within four months of his filing in bankruptcy, the effect of which is to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class. Subsection (b) allows the trustee to avoid the preference, if at the time the transfer is made, the creditor has " * * * reasonable cause to believe that the debtor is insolvent."

Again, we must be concerned with what the Allied trustee might recover from Haupt and Bunge under this section because Haupt is a creditor in the Allied bankruptcy and will share in the Allied estate if there is no settlement. Of course, what Haupt might have to contribute to that estate by virtue of § 60(a) (b) must be matched against its dividends as a creditor.

The federal statute thus requires: 1) a debtor-creditor relationship; 2) a transfer of property by the debtor on account of an antecedent debt; 3) transfer while the debtor is insolvent; 4) transfer within four months of bankruptcy; 5) that the transferee obtain a greater percentage of his debt than other creditors in his class; and 6) that the transferee have reasonable cause to believe the debtor insolvent at the time of transfer. We have just reviewed the data in the record on the Haupt-Allied transfers within the four-month period. There is no question that transfers of property were made. We can assume that transferees got greater percentages of their debts, where debt is found, than others of their class. With these facts and assumptions we must examine the other elements.

1. *Haupt-Allied Creditor-Debtor Relationship*

a. *Export Loans*

There is an obvious creditor-debtor relationship existing between Allied and Haupt as to the export loans. Interest was paid on the loans (Tr. p. 1346, 1354), and collateral was posted (Tr. p. 1349, 1359–60, Sloan Exh. N–4).

b. *Spot Oil*

The $6.8 million transfers from Allied to Haupt with respect to spot oil consisted of margin payments and partial payments for transfers of the oil. The question is whether Haupt was in the position of creditor with respect to either of these. The Bankruptcy Act defines a creditor as "anyone who owns a debt, demand, or claim provable in bankruptcy," 11 U.S.C. § 1(11). It would seem, then, that one would have to determine whether when Haupt purchased the warehouse receipts covering the spot oil, Allied was bound to, in turn, purchase all the oil represented by the receipts so that Haupt would have a claim against Allied if it did not purchase the oil. Haupt is asserting a $3 million claim against Allied in the nonregulated account, which is mostly spot oil (Sloan Exh. N–1, Tr. p. 1345). It would seem then that Haupt may well be a creditor of Allied's in this account, despite objectants' assertion that consideration passed when Allied paid for and received the oil. This latter theory assumes no obligation on Allied's part until payment is made. In fact, Haupt may be acting as Allied's agent and the oil represented by the receipts may really pass to Allied when Haupt buys it.

The Allied trustee has another theory which would seem to make Haupt the creditor in the spot oil account (Tr. p. 647–50). This is that Allied forged delivery receipts for most of the oil and thereby got it long before Allied paid for it. When a bankrupt has stolen or converted property belonging to another, a debtor-creditor relationship may arise if the owner of the property so elects. 3 Collier, Bankruptcy ¶ 60.18. Haupt has filed a claim on the spot oil account and might be considered to have elected a *stance* as creditor. The evidence supporting this theory is somewhat weak. The Haupt trustee was told by someone that there was testimony as to the forged delivery orders, and his counsel, unsworn, interrupted to say DeAngelis stated it to him on one occasion (Tr. p. 649).

c. *Futures Contracts*

The Allied trustee claims Haupt to be a creditor on the futures account because of an alleged time lag between when Haupt advanced margin and then got the money back from Allied (Tr. p. 1110). The Haupt trustee consistently objected to the use of the word "credit" in describing the futures transactions (Tr. p. 559, 560, 562–3, 565, 635A–7, 641–2, 644–5) when objectants were try-

ing to characterize them. The trustee insisted that Haupt was acting as a "broker" (Tr. p. 636, 637, 641). However, the trustee made it clear that when Haupt got a contract, Allied was obligated to advance the margin (Tr. p. 641).

The first problem is whether a broker can be a creditor with respect to his customer. Since the trustee says Allied was obligated to supply margin, presumably, the broker could then sue his customer if the former had advanced the margin and the latter refused to reimburse him. Such a claim should be provable in bankruptcy, and the broker would then be a creditor within 11 U.S.C. § 1(11).

The second problem is factual. We don't know whether Haupt advanced money to the Produce Exchange for margin and later collected from Allied, or incurred an obligation to the Exchange (or Chicago Board of Trade) and got money from Allied to pay it (Tr. p. 564-5, 641). If the former, Haupt might be construed a creditor within 11 U.S.C. § 1(11) as seen, supra. If the latter, Haupt has only a contractual obligation to the Produce Exchange for the satisfaction of which it may look to Allied. This does not sound like an extension of credit, although objectants would prefer to think of it as such and as "consideration" for the margin payments, (Tr. p. 640-45). Even where the margin checks were associated with particular, earlier margin calls (Tr. p. 2000-03), we do not know whether Haupt had paid that margin or merely incurred an obligation.

### 2. *Haupt-Allied Antecedent Debt*

#### a. *Export Loans*

▮▮▮▮ Antecedent debt is another element to be considered. The $6 million in export loans repaid by Allied clearly involve pre-existing or antecedent debt (Tr. p. 628-9, Sloan Exh. N-4). The largest repayment of $2.5 million on August 15 was for a loan of May 28. The objectants argue that there is no preference despite the preexisting debt because the warehouse receipts serving as collateral were returned upon repayment of the loan and were consideration for such repayment. The object of avoiding preferences is to prevent favoritism among creditors, and obviously where there is no depletion of the debtor's estate there is no favoritism, 3 Collier, Bankruptcy ¶ 60.19. The thrust of the objectants' argument is that the return of the receipts prevented a depletion of Allied's estate. This is necessarily predicated on the assumption that these warehouse receipts were backed by the oil on their face. However, testimony (Tr. p. 628-35) indicates there is evidence, if not strong evidence, that the warehouse receipts returned were among the fraudulent ones, i. e., backed by little or no oil (Tr. p. 1201-07). Such fraud upon Haupt by Allied would not prevent Allied's recovery of a preference. *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

#### b. *Spot Oil*

If the spot oil account is as described in the debtor-creditor section above, a finding of antecedent debt would appear to be inevitable. The objectants argue that consideration passed to Allied in the form of oil when Allied made the $6.8 million in payments. However, under one theory in the section above Allied was contractually bound to the oil before it paid for it, and under the other theory Allied had converted the oil to its own use before paying for it.

#### c. *Futures Contracts*

If the debtor-creditor relationship can be established, then the Allied transfers to Haupt with relation to futures contracts would be for a pre-existing debt since it would have been established that Haupt had paid the margin to the Produce Exchange and Board of Trade as an advance, looking to Allied for reimbursement. The problem is factual as we saw above.

Objectants have an interesting alternative way of viewing these transactions (Tr. p. 640-46), assuming Haupt merely incurred an obligation for the margin to the Exchange and Board.

They view the incurring of this obligation as a consideration rendered Allied for the margin payments. This is really looking at the futures contracts account as a single entity rather than examining each specific transfer back and forth. The idea suggested is that Haupt would not be obligating itself on margin daily if Allied were not paying margin over daily, and the sum total of transactions running one way is in consideration for the sum total running the other way. This is a novel way of giving recognition to the reasoning underlying the running account theory (explored below) without adopting it. The reasoning is that where two parties are almost daily making transfers to each other, we cannot just look at the transfers of one party and say that the other party is being made a favorite creditor by these transfers, since the *same* money can be going back and forth between the parties. If this view were adopted, none of the transfers in this account would be for an antecedent debt, and the whole account would be removed from the provisions of § 60(a) (b). The trustee says the argument can be made, but it is not a strong one (Tr. p. 645–6).

### 3. *Allied's Insolvency*

This is primarily a factual question on this settlement. We do not have complete data on Allied's financial situation at the time of each transfer alleged to be preferential.

The strongest set of facts supporting Allied's insolvency is found in the direct testimony of Powers (Tr. p. 1459I–1585) on the loans made by the Amexco banking subsidiary to Allied between June of 1962 and Allied's filing in bankruptcy. Since we are concerned only with the four month period during which the alleged preferences were made, much of the data about the first two loans cited, *supra*, made in June of 1962 and October of 1962 can be skipped. Suffice it to say that Amexco, Inc., was unable to get financial statements of Allied any more up to date than October 31, 1961 (Tr. p. 1475), and those were kept confidential and unaudited (Tr. p. 1476). See Sloan Exh's. AO-1 through AO-8. DeAngelis was required to guarantee these loans to Allied and to submit personal financial statements (Tr. p. 1486). Banks had closed out Allied accounts because of irregularities (Tr. p. 1485, 1508–10), one of which was Marine Midland which reported Allied with insufficient funds for several large drafts (Tr. p. 1510). Neither of the first two loans were paid on time, and repeated calls and inquiries had to be made to get repayment (Tr. p. 1519–27, 1540–8). When the loans were repaid new loans in the exact same amounts followed within days (Tr. p. 1527, 1548–9).

The third loan was made on June 7, 1963, which is just a matter of weeks before the four-month transfers begin, so evidence of Allied's insolvency at this time is important. The second loan had been repaid on June 5, 1963, although due the previous January, and Allied stated in a letter at the time of repayment that it would like a new loan in the same amount (Tr. p. 1553–4). Powers had discussed the possibility of a new loan in May (Tr. p. 1555–6). The loan limit to Allied expired on June 11, 1963, and an application was prepared for a new limit but never submitted to the credit committee because Powers could not get Allied financial statements despite repeated requests (Tr. p. 1557).

There is evidence that Haupt took delivery of spot oil for Allied only because Allied did not have the cash (Tr. p. 1117) and that Haupt accepted product margin on the futures contracts for the same reason (Tr. p. 1128). While a shortage of cash does not necessarily mean insolvency, a trier of fact might infer such when it is accompanied by a shortage of the company's major asset, oil, as inferred from Allied's use of forged and fraudulent warehouse receipts. See also the Bunge inspection incident as described below.

#### 4. Haupt's Reasonable Cause to Believe Allied Insolvent

This is again primarily a factual issue. On settlement we should be concerned mainly with what evidence could go to a trier of this fact. The Haupt trustee testified as to why Allied's counsel *contends* Haupt had cause for such knowledge (Tr. p. 614–18). His contentions revolve around Haupt being put on notice, or having a duty to investigate, because of knowledge about DeAngelis' past, the fact that other brokers had refused business with Allied (Tr. p. 1118 —established as fact), that their own counsel advised them not to do business with Allied, that they got uncertified checks for certified ones, that the Allied balance sheet they got showed financial irresponsibility. The Haupt trustee refused to say there was no basis for these contentions (Tr. p. 619), and the referee referred to some of the contentions as of such "public repute" that there must be a basis in fact for them (Tr. p. 620). Minutes later (Tr. p. 621) the trustee said there was a good basis for these contentions, that the facts were undisputed, and the question was as to the inferences to be drawn from them.

It appears that Haupt was unable to get Allied financial statements before it advanced any monies (Tr. p. 1020–1). The trustee also refers to a meeting in a Newark restaurant in either September or October, at which two employees (not partners) of Haupt were present. He is not very specific, but claims that enough transpired at this meeting to put these Haupt employees on actual notice of Allied's insolvency (Tr. p. 1023–5, 1066–7). Minutes later (Tr. p. 1071) the trustee testifies to additional facts at this restaurant meeting indicating that Allied told the Haupt employees that Bunge was refusing to advance any more credit, and they needed $5 million from Haupt to continue business.

#### 5. Bunge-Allied Debtor-Creditor Relationship

Since we do not have any specific facts about the types of transfers between Bunge and Allied, we cannot perform the same analysis as was done with Haupt. We do know the Allied trustee claims a debtor-creditor relationship with respect to $112 million in Allied transfers to Bunge, for he is suing for their return as preferences (Tr. p. 214, 312, 323, 529). Part of the maximum amount of $44 million due from Allied to Bunge at a given time consisted of registered warehouse receipts *sold* to Bunge, which the Allied trustee is choosing to consider as financing although Bunge did not so consider it on its books (Tr. p. 1238–9). There are no figures on the size of this part of the $44 million. Another $20 million of the $44 million is attributed to the "float" described above. One can argue that this was credit in that the Bunge cashier held the uncertified checks until Allied agreed to their deposit, which is in effect a loan of the money represented by the checks. However, Bunge denies knowledge of this float (Tr. p. 1140), and unless the cashier's knowledge can be attributed to his employer, the real creditor would seem to be the cashier.

#### 6. Bunge-Allied Antecedent Debt

There are no data in the record as to how much of the alleged $112 million transferred from Allied to Bunge in the four month period preceding Allied's filing in bankruptcy was for antecedent debt.

#### 7. Bunge's Knowledge of Allied's Insolvency

There is an abundance of evidence in the record as to Bunge's knowledge of Allied's insolvency. It stems from a check made by Bunge in September of 1962 of the tanks for which Bunge held two Harbor Tank warehouse receipts. Evidence with respect to this check comes from the affidavits of DeAngelis and one Covington Hardee, attorney for the Fidelity and Casualty Insurance Company, which are part of Sloan Exh. Q, consisting of papers in a state court action by New York's Attorney General.

The trustee testified to having read these affidavits (Tr. p. 667, 669, 674, 1009–10). Bunge had sent two employees of Superintendence Company to check the tanks. Allied refused to allow the check, threatened the men with a gun, and then offered a $25,000 bribe. The employees reported all this to their employer. The affidavits go on to describe a meeting between Bunge officers and Allied, including DeAngelis, the day after the incident. DeAngelis disclosed a shortage of oil in the amount of $7 million in his tanks to Bunge, and Bunge then insisted on taking only Limited warehouse receipts from then on and swore everyone to secrecy. The trustee testified that there was testimony by employees of Superintendence to support this (Tr. p. 676), that "some testimony" supports these allegations (Tr. p. 1014), that he had "information" which tended to support these affidavits (Tr. p. 1015), and that there was some testimony of DeAngelis which supported them (Tr. p. 1242). It is important to note that this evidence goes to Bunge's actual knowledge of Allied's insolvency (Tr. p. 1026).

There is support for Bunge's knowledge of Allied's insolvency in the fact that after September 1962 Bunge insisted on making its own inspection of Allied's tanks and got greater insurance coverage and all risk insurance (Tr. p. 1136). However, Bunge denies any knowledge of insolvency based on this inspection incident (Tr. p. 1133), and its version of the facts is set forth in excerpts from its answer to the New York Attorney General's complaint (Tr. p. 1033–48). It claims DeAngelis told it only that there was a mix-up in pumping oil to the tanks and that it switched from Harbor Tank receipts only because Harbor Tank did not seem to have adequate control over its field warehousing. It claims it found Allied's books in order and an excess of oil in unpledged Limited tanks. It also points to the significant fact that it continued to extend credit to Allied (Tr. p. 1134–1135).

There is, therefore, a sharp issue of fact as to Bunge's actual knowledge of Allied's insolvency in September of 1962. Assuming such knowledge, there is the legal problem as to whether knowledge in 1962 raised the duty to investigate from July 1963 till November 1963 which would show reasonable cause for believing Allied insolvent in the four months preceding bankruptcy.

### 8. *The Running Account Theory*

Although, as seen, Allied allegedly transferred $112 million to Bunge in the four months preceding the former's bankruptcy, there were transfers running the other way also, so that it is clear that Allied was not repaying a massive initial debt of $112 million. In fact, the net amount owing Bunge reached its peak at only $44 million in September 1963. Thereafter, it shrunk to $16 million by November 19. The objectants argue that only this decrease from the maximum indebtedness in the amount of $28 million can be recoverd as preferences, because Bunge has only been shown favoritism to this amount, the other transfers by Allied being offset by new extensions of credit.

The objectants find it in their interest to limit the Bunge recovery this way because a similar theory applied to Haupt results in only a negligible recovery by Allied, leaving Haupt to share in the Bunge contribution to Allied's estate. The maximum amount due Haupt from Allied in the four month period was $12.2 million on November 11, 1963 (Sloan Exh. N–2, Tr. p. 2011–12). Subsequent to that date Allied transferred $688,900 to Haupt (Sloan Exh. N–8) but received $609,000 from Haupt (Sloan Exh. AA, Tr. p. 1387–9). Objectants argue that there was, therefore, only a net decrease in Allied indebtedness of $79,900, and Haupt was only favored to this extent. The loss by Haupt to Allied of only $79,900, while Allied gains $28 million from

Bunge would greatly benefit Haupt's claim in the Allied bankruptcy (and argue against settlement). With Haupt holding 18–22% of the claims in the Allied proceeding, it could expect to receive a substantial dividend well in excess of the $2.5 million compromise.

Before proceeding to the legal premises of this running account theory, it would be well to note some factual problems. Sloan Exh. N–2 shows the net decrease in indebtedness from November 11 to 19 as nearly $2 million, not $79,900. Second, the Bunge figures include nearly $15 million in Allied debt decrease (from $20 million in September to $5.4 million on November 19) due to the float (Tr. p. 2015–17). It is highly questionable whether the float was Bunge credit, and, if not, the preference recovery from Bunge would be cut to $13 million. Third, we have no data on the *types* of Bunge financing; we cannot analyze such as with Haupt and decide whether there is a true debtor-creditor relationship and a transfer for antecedent debt.

Finally, the running account theory is premised on the feeling that where there are day-to-day transactions between debtor and creditor running both ways it would be unfair to look only at the transfers by the debtor. The cases cited include no running transactions similar to the ones we have here. It may be that the running account concept would be applied to only one of the types of accounts, such as the futures contracts, rather than the whole debtor-creditor relationship. We cannot measure the effect of this on Bunge, since we have no data on a futures contracts account. Also, recognition of the fairness of a running account here might give rise to a different theory. The trustee's brief argues that one should look at the indebtedness at the *beginning* and end of the four month period and allow recovery only where there is a decrease.

The objectants cite a number of cases (p. 77 of their brief) in support of the applicability of a running account theory

under § 60(a)(b), Bankruptcy Act. None of them was decided much past the turn of the century, and for a very good reason. Prior to 1903 the Bankruptcy Act allowed the recovery of a technical preference, that is, one meeting the definition in what is now § 60(a). There was no requirement that the transferee have cause to believe the debtor insolvent. This was a harsh rule as far as creditors were concerned. The running account theory developed as a somewhat illogical (there is nothing in the elements of preference to suggest a running account theory) device for protecting creditors who had no reason to suspect the debtor's insolvency and continued to do business with him. The reason for the rule, therefore, disappeared in 1903. 3 Collier, Bankruptcy ¶¶ 57.19[4.1], 60.23; Campanella v. Liebowitz, 103 F.2d 252 (3rd Cir. 1939); Ricotta v. Burns Coal & Building Supply Co., 264 F.2d 749, fn. 1 (2d Cir. 1959); Cooper Petroleum Company v. Hart, 379 F.2d 777 (5th Cir. 1967). In none of the cases cited by objectants did the transferee creditor have cause to believe the debtor insolvent. The running account theory never really did square with the Bankruptcy Act, because at each single moment when the preferential transfer occurs, there is a diminution of the assets available to other creditors even if this is later made up by an extension of credit. The running account theory treated the four month period as a whole, rather than looking at each transfer. Even assuming that Collier's view of the running account is wrong, there would still be enough authority in favor of his view to justify a settlement insofar as this theory is concerned.

9. *Section 60(c) of the Bankruptcy Act*

This brings us to the one part of the Bankruptcy Act that may encompass some of the justifications of running account, § 60(c), 11 U.S.C. § 96(c).

This statute provides:

"If a creditor has been preferred, and afterward in good faith gives the debt-

or further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him."

The application of this section to the Haupt-Allied transactions would seem amazingly complex. The parties virtually ignore it, each one mentioning it only in passing, and we might ignore it since the factual issues alone in connection with running account theories seem to justify settlement.

■ However, we will note a few things about the section in passing to point up the difficulties of its application here. See generally 3 Collier, Bankruptcy ¶¶ 57.19[4.2], 60.67. The section comes into effect only if the creditor makes a "good faith" extension of credit after receiving a preference. The objectants are correct in that this does not mean the creditor must have no cause to suspect the debtor's insolvency. It means only that the extension be for some honest purpose and not to defeat the Bankruptcy Act by secreting the proceeds. Kaufman v. Tredway, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904); In re Hygrade Envelope Corp. v. Gibraltar Factors Corp., 393 F.2d 60 (2d Cir. 1968), cert. denied, sub nom. Gibraltar Factors Corp. v. Baranow, 393 U.S. 837, 89 S.Ct. 114, 21 L.Ed.2d 108 (1968).

The section applies only if the extension of credit is unsecured. The Haupt export loans here were collateralized by warehouse receipts. It is true that those receipts returned upon repayment were fraudulent, leaving one to infer that the ones not returned were also fraudulent. It might be that fraudulent receipts might be held not to be security, see In re Tanner, 6 Am.Bankr.Rep. 196 (Ref., D.C.N.Y.1901), and that therefore export loans could be considered extensions of unsecured credit. However, it would be a legal question upon any trial.

■ The greatest problem with the application of this section is that the extensions of credit may be set off only against *prior* preferences. 3 Collier, Bankruptcy ¶ 60.67, p. 1139. One would need a computer to apply this rule to the Haupt-Allied transfers. More specifically, the $2.5 million export loan on August 15 (Sloan Exh. N–4), assuming it to be unsecured and never repaid, could be set off only against preferences made prior to that date. Sloan Exh. N–8 shows Allied checks to Haupt prior to August 15 in only half that sum. A separate calculation would have to be made with respect to each extension of credit by Haupt to see how much of it remained outstanding on November 19 and then applying that sum against preferences found only prior to the date that particular credit was extended.

Needless to say, there is no information by which the impact of § 60(c) could be measured on Bunge.

### D. *Other Statutory Provisions*

The Allied trustee also brings his claims against Haupt and Bunge under § 67(d) of the Bankruptcy Act, and N.J. Stat.Ann. §§ 14:14–2, 25:2–1 et seq. and 25:2–7 et seq. (all as provided by § 70 (e) of the Bankruptcy Act). This court does not believe it is necessary to focus its attention on these statutes for the reason, simply, that its analysis of the preference provisions of the Bankruptcy Act should suffice in and of itself to justify the compromise.

The New Jersey insolvency transfer statute, N.J.Stat.Ann. § 14:14–2, should be evaluated briefly because of the focus of the parties on this law. First, and most important of all, since the parties filed their papers it has been repealed. N.J.Stat.Ann. §§ 14A:16–3, 16–4. The repeal was effective January 1, 1969, and the new Title 14A now contains a section very similar to § 60(a) (c) of the federal act. Although the Haupt trustee seems to think that whatever New Jersey mod-

ification is currently in force would be the law applicable in the Allied suits (Tr. p. 654) (making the task easy, since it conforms now to federal law) that theory does not comport with the theory that the law applicable is the law in force at the time of the transfer in question unless the new law is expressly made retroactive.

At any rate, this repeal suggests the inadvisability of relying on the New Jersey law in analyzing this settlement because the New Jersey legislature obviously thought it harsh and the court now might well adopt some "new" mitigating doctrine, such as running account, to the Allied suits—"new" because neither case relied upon by objectants supports a running account theory. Cappa v. MacArthur, 133 N.J.Eq. 7, 29 A.2d 718 (N. J.Ch.1943), is an extremely confusing and short opinion which has never again been cited by any court for anything, and Schwartz v. Maguire, 131 N.J.Eq. 578, 25 A.2d 920 (1942), likewise did not involve running account.

Thus, this court agrees with the trustee (Tr. p. 1108, 1226) that no cases have been shown pointing to a running account theory in New Jersey, although the harshness of the statute (which allowed recovery of transfers where the transferee has no knowledge of insolvency if the debt was antecedent and recovery if there is knowledge even where there is present consideration for the transfer) might seem to demand such mitigation much as pre-1903 federal law looked to running account.

The Allied settlement is justified since the factual and legal issues are patently uncertain and extremely complicated. Haupt clearly is not guaranteed a recovery of several million dollars in the Allied proceeding. For all the foregoing reasons, the order and decision of the referee are affirmed.[7]

7. The court did not consider any of the materials handed up to the court on the hearing of this petition by the trustee's counsel. The court has relied exclusively on the record before the referee.